KILBURN B. WALKER *v.* THE CITY OF BURLINGTON.

*Grand List.     Two Oaths Required to make it Valid.     Taxation.     Assessment.     Government of the City of Burlington.     How Taxes should be Assessed under its Charter.     Tax Law of* 1880, *No.* 78.

1.  The act of 1880, passed to "equalize taxation," formulated only one oath for listers; but as this act is only a part of an established system, and is to be read in connection with existing statutes *in pari materia*, and as these required certain specified oaths. *Held*, that in order to make a valid grand list under the act of 1880, it is necessary for the listers to take both oaths; the one being preliminary and a qualification for office; and the other a certification of the completed list.

2.  THE CERTIFICATE REQUIRED BY THE STATUTE MUST BE ATTACHED TO THE LIST OF REAL ESTATE, signed by the assessors and verified by their oaths, and within the time limited by law; thus, the act of 1880 required an appraisal of the real estate in 1881, although not an appraisal year under the prior statute; the defendant's assessors appraised it, but, long after the limited time, attached to the list the certificate prescribed for years when there is no appraisal of real estate. *Held*, that the list was invalid as a basis of taxation.

3.  ASSESSMENT OF TAXES UNDER THE CHARTER OF THE CITY OF BURLINGTON.     To constitute the assessment valid, it is necessary that the resolution levying taxes be adopted by the aldermen assembled as such, independently of the mayor, and then be submitted to the mayor, and approved by him; thus, the resolution levying the taxes in question was

passed by the board of aldermen and by the president of the board, sitting with and voting as one of the board, the president also acting as mayor at the time; but the resolution was never formally submitted to the acting mayor for his approval, and he never approved it except by voting for it while sitting with the board. *Held*, that the taxes were assessed in an illegal manner, in that the resolution did not have the concurrence of the two tribunals appointed by the charter for its consideration.

ASSUMPSIT to recover money paid under protest by the plaintiff to the defendant for taxes assessed on real estate. Plea, the general issue. Trial by jury, September Term, 1882, Chittenden County, TAFT, J., presiding. Verdict for the plaintiff. The defendant's assessors, having completed their labors on the grand list for 1881 on the 14th day of June of that year, took before a justice of the peace on that day the following oath :

"We do solemnly swear that we have set down all the real estate situate in the city of Burlington, and have appraised all additions, and have made all deductions required by law, according to the best of our information, and that the foregoing list contains a true statement of the aggregate amount of the taxable personal estate of each person named in such list according to the best of our information and belief. So help us God."

It appeared that the assessors did not sign any such oath, or any certificate in respect to the list, and that the magistrate did not make any certificate that any such oath, or certificate, was subscribed and sworn to until the 29th day of September, 1881, when the assessors signed the said oath and certificate; and the justice, who had administered the oath to them on the 14th day of June, thereupon signed, below their signatures, the following certificate:

"*State of Vermont, Chittenden County:* Sworn to at Burlington, the 14th day of June, 1881, and signed by said assessors, September 29th, 1881, personally appeared B. S. Nichols, Henry Green and S. M. Pope, whose names as assessors are subscribed to the foregoing oath, and were sworn as therein set forth in due form of law. Before me." [Signed].

The oath and certificate of the assessors and certificate of the justice were appended to the said grand list, which list had been filed in the city clerk's office on the 15th day of June, 1881.

The assessors took no other oath and signed no other certificate, except the preliminary oath required by section 13 of the Act of 1880, No. 78.

The taxes in question were voted on the 15th day of July, 1881, at an adjourned meeting of the city council of Burlington. J. D. Hatch was mayor for the year 1881, commencing the first Monday in April, and U. A. Woodbury was president of the board of aldermen during the same time, and, as such, in the absence of the mayor from the city, was the acting mayor.

Mr. Hatch was present and presided as mayor at the meeting of the city council on the 5th and 7th of July, 1881, at both of which the matter of taxes for that year was considered and discussed; but no conclusion was arrived at. The meeting was adjourned from the 7th to the 12th. But previous to the 12th Mr. Hatch left the city and went to Canada, where he remained till the 28th of July. Before leaving, Mr. Hatch informed the board of aldermen what amount of taxes would be satisfactory to him, provided they would make such appropriations as he had suggested.

He directed the city clerk, who was clerk of the board of aldermen and the city council, to inform him by telegraph what action was taken during his absence, on the subject of city taxes; and accordingly, directly after the 15th of July, the clerk telegraphed him the result of the meeting of that date. Mr. Hatch returned on the 28th of July, remained till the 2d of August, when he went back to Canada, and was there till the 11th of August, when he again returned to Burlington.

While Mr. Hatch was so absent in July and August, Mr. Woodbury was in Burlington, and was acting mayor. On July 29th, Mr. Hatch, in his capacity of mayor, desiring to be exactly informed as to the action taken in the matter of taxation and appropriations during his absence, requested the city clerk to hand him the resolution which had been adopted on the 15th of July, and the city clerk did so. The mayor examined the resolution carefully, and found that its provisions were in accordance

with his recommendations as to appropriations, and were entirely satisfactory to him, and he handed it back to the clerk. He neither made any objections to the resolution in writing nor otherwise, nor did he sign the same.

The reason why he did not sign the resolution was because he considered that having been passed as it had been at a meeting of the city council presided over by the acting mayor, it became a valid vote by its passage, and did not require the signature of the mayor.

The resolution or vote was not signed by Mayor Hatch or by acting mayor Woodbury; and it was in no way presented to the latter after its passage, and no further action in respect to it was taken by either of them or by the board of aldermen than is above set forth, except the record of the meeting of July 15th shows that Alderman Woodbury was present, and presided as acting mayor; and that he voted for the resolution levying the taxes, with seven of the other aldermen.

In accordance with the vote of July 15, the city clerk proceeded at once thereafter to make up the tax-bills thereunder on the grand list of the city for 1881. He certified such tax-bills as completed on the 9th day of August, and placed them in the hands of the city treasurer for collection on the 13th of August, 1881.

Under the provisions of the city charter, and the notice published by the city treasurer in accordance therewith, these taxes became delinquent after the 21st of September, 1881.

*Roberts & Roberts*, for the defendant.

The grand list was complete without the oath or certificate required for the quadrennial grand list. The list was made under the act of 1880, No. 78. All acts inconsistent with that act are repealed. S. 19. A new appraisal of real estate was required, to take the place of the quadrennial appraisal of 1878, discarding the action of the equalizing board, to stand only for the year and list of 1881. Section 17 brings the next and succeeding quadrennial appraisals within s. 1 of the act; it does not bring

this act within the law regulating quadrennial appraisals. Section 13 prescribes a very stringent oath, doubtless, a substitute for the official oath prescribed by the act of 1872, No. 58.

Clearly, the act of 1880 was designed to be complete in itself, and to set forth particularly all the duties required of the listers as to the list of 1881. The fact that no subsequent oath or certificate was required by the act of 1880, is proof that it was not intended. The oath, and certificate thereof, that the listers had done what they had shortly before sworn and certified that they would specifically do, seem to have been thought unnecessary, which would be much like swearing a witness both before and after he had testified.

If the preliminary oath had been merely the general official oath, it might have been different, as was said in *Ayers* v. *Moulton*, 51 Vt. 118.

The taking of unnecessary oaths should be discouraged.

The former law had not formulated any oath to be attached to the completed list which was adapted to express the past performance of the duties prescribed by the act of 1880.

The form given in G. S. c. 83, s. 35, falls short of expressing the requirements of the act of 1880. By no rule of construction can you import into the act of 1880 the provisions of G. S. c. 83, s. 35, as to oaths. 1881 was not a quadrennial year under the act of 1872, nor was any appraisal made in 1881 *under that act.* The case is not one of a repeal of the General Statutes or the act of 1872 on the subject of oaths, etc.; but those provisions have no application to the appraisal made in 1881.

It is admitted that the approval of the mayor is essential to the perfection of the assessment; but we deny that this approval can be shown only by an actual *signature* of approval to a resolution of the board drawn up in form, etc. *Blanchard* v. *Bissell*, 11 Ohio St. 96. The action of the acting mayor in voting for the resolution, and of Mr. Hatch, after his return, is in law an approval. *Adams* v. *Field*, 21 Vt. 256 ; *Rowe* v. *Hulett*, 50 Vt. 637 ; *Holland* v. *Osgood*, 8 Vt. 276 ; *Crosby* v. *School District*, 35 Vt. 623, 630 ; *Free Press Association* v. *Nichols*,

Walker *v.* Burlington.

45 Vt. 7; *Collins* v. *Perkins*, 31 Vt. 624; *State* v. *Hanley*, 47 Vt. 290; *Downer* v. *Baxter*, 30 Vt. 467; *Goodwin* v. *Perkins*, 39 Vt. 598; Cooley Tax. 212; Sedg. Stat. Law, 308; *Reed* v. *Chandler*, 32 Vt. 285.

*Wm. G. Shaw*, for the plaintiff.

The grand list was not legal as a basis of taxation.   It lacked the essential prerequisites of a certificate appended thereto, signed and sworn to by a majority of the assessors.   G. S. c. 83, ss. 35, 36; *Reed* v. *Chandler*, 32 Vt. 285; *Houghton* v. *Hall*, 47 Vt 333; *Tunbridge* v. *Smith*, 48 Vt. 648; *Rowe* v. *Hulett*, 50 Vt. 637; *Myers* v. *Moulton*, 51 Vt. 115.   The certificate was not the proper one, even if it had been seasonably signed. It was different in substance from the one prescribed by the statute, the one when there is no valuation and appraisal of real estate.   G. S. c. 83, ss. 35, 36.   There is nothing in the Act of 1880 inconsistent with the general provisions of the law requiring grand lists to be certified by the listers.   Certainly the intention of the law of 1880 was not to remove any of the safeguards which had long been prescribed to secure a fair list.   And from the earliest history of the State a certificate to each and every list by the signatures, if not by the oaths, of the listers has always been required.   Act of 1797, s. 16 (Slade's Com. s. 824); Rev. St. p. 544; Com. St. p. 460, s. 35; G. S. p. 522, s. 35.

The tax was assessed in an illegal manner.   The aldermen are the legislature of the city; the mayor is the chief executive. The aldermen meet by themselves, are presided over by their president, one of their number, and pass such votes as they choose.   The mayor does not meet nor sit with them when they act in a legislative capacity; but their votes are presented to him for approval or disapproval.   The voting of taxes must be by resolution or vote of the board of aldermen, as such, independently of the presence of the mayor; and their vote is to be presented to the mayor, outside and independent of the board, for his approval.   The body that passed the resolution was as anomalous and irregular a body as the legislature of the State would

be should it sit conjointly with the governor for the passage of laws.

The opinion of the court was delivered by

POWERS, J. I. No. 78 of the Acts of 1880, entitled "An Act to equalize taxation," repealed so much only of the existing law upon the subject of taxation as was inconsistent with its provisions. *See* section 19.

Although it introduced some radical changes, still it was to take its place in an established system, and is to be read in connection with existing statutes *in pari materia*.

Real estate, though then already valued for purposes of taxation under the last quadrennial appraisal, was to be valued anew in April, 1881; and such new valuation in the language of section 16 of said act of 1880, "shall be substituted for the last quadrennial appraisal, and continue in force *in lieu* thereof, *until* the next quadrennial appraisal is made." By section 16 it is further provided that no equalization of such appraisal shall be required. The legislature, therefore, as to real estate temporarily *substituted* the appraisal of April, 1881, for the quadrennial appraisal then in force. Quadrennial appraisals, however, made after the formalities of existing laws were not abrogated, as appears by section 17 of the same act, which refers to them as still parts of the system of taxation.

All lists of taxable estate, personal or real, must be duly certified and sworn to. Without an attestation of correctness and genuineness, as made persuant to law, tax payers have no assurance that the list is fair, equal and properly made, and that thus their money is taken from them by due process of law; and public officials, administering the law, have no official action of the listers upon which to base a justification for their doings.

It is said that the preliminary oath formulated in the act of 1880 covers the whole ground of official duty imposed upon the listers, and if any further attestation were necessary it would have been provided for; and to now insist that the completed list should have appended an oath in scope substantially like such

preliminary oath is much like swearing a witness before and after he gives his testimony.

Prior to the act of 1880 two oaths were required of the listers —one before commencing their duties, and one verifying the grand list. It would hardly be seriously maintained that either could be safely omitted as the law then stood. But the two oaths are not ordained for the same purpose. The preliminary oath is a *qualification for office;* the subsequent oath is an *authentication of an official act;* the first is to be filed in the town clerk's office, and is commensurate with the whole scope of the lister's official duty under the law; the latter is appended to and validates only the document certified to be legally made. The preliminary oath required by the act of 1880 is more explicit than the former one of 1872; but this in no sense changes its purpose, or its character as an official qualification. It embodies the general obligation of the lister, under the penalties of perjury, to "faithfully discharge all the duties conferred upon me by law."

The grand list of 1881 was by the act of 1880 to be made upon a fresh appraisal of *real* as well as personal estate. In the appraisal of real estate experience has demonstrated the necessity of a revisory power over the judgment of the listers, in order that a fair and just basis of taxation may be established between the several towns in a county, and between the several counties in the State.

The boards established for the equalization of such appraisals certify to their actions under oath. Indeed, for many years the necessity of a sworn authentication of the appraisal by every official hand concerned in making it has been deemed vital to its validity as an official document. By the act of 1880, the appraisal of real estate is to be " made in connection with the annual list and *completed* and *filed* at the same time as required by law for annual lists." The appraisal is not *completed* until sworn to. As no further revisory action is, under the act of 1880, to be had over the appraisal of the listers, and as the appraisal is to be a substitute for the quadrennial appraisal then in force, and is to

continue as such substitute until the end of the current quadrennial term, and be the basis of future taxation voted by subsequently elected officials, it cannot be taken that the legislature intended to relax any of the cautionary verifications which long usage and the general theory of the law on this subject had sanctioned. The act made the year 1881 a substitute year of real estate valuation, and left the listers to find the formalities and essentials of such valuation in the general law applicable to the case.

The assessors did not, in their certificate appended to the list, swear to their appraisal of real estate; they merely certified that they had *set down* all the real estate in Burlington; and this certificate was not subscribed by them until September 29, 1881— long after the time fixed by law therefor, and long after the taxes in question were assessed. The certificate contains no averment that the real estate had been appraised as it would be appraised "in payment of a debt from a solvent debtor," nor "at its true value in money," nor indeed that it had been appraised at all. We think the grand list was radically defective in substance and invalid as a basis of taxation.

II. The charter of the city of Burlington vests the administration of all the fiscal, prudential, and municipal affairs of the city, and the government thereof, in one principal officer to be styled the mayor, and one council of ten members to be denominated the board of aldermen, and declares that the mayor and board of aldermen *in their joint capacity* shall be called the city council. Charter, section 3.

Other sections specifically define the respective duties of the mayor, the board of aldermen and the city council.

In the appointment of certain officers and the abatement of taxes, the mayor and board of aldermen sit together—the mayor presiding and having a vote. Charter, section 5.

But in the enactment of ordinances, and the adoption of all legislative measures, like the levying of the taxes in question, the mayor does not sit with the aldermen. His function in this behalf is not to deliberate and vote with the aldermen, but to

approve or veto their action when submitted to him. Charter, section 19.

This section of the charter plainly contemplates the independent action of the aldermen in the first instance, and the subsequent approval of the mayor as necessary to the adoption of ordinances and resolutions. It further provides that the aldermen may pass, by a two-thirds vote, any resolution which the mayor has disapproved. Here the taxes in question were levied by a convention in which the acting mayor sat with and voted as a member of the board of aldermen. The resolution by which they were levied was not passed by the body having the power, under the charter, to pass it. It was not adopted by the aldermen assembled *as* such and then submitted to the mayor, or acting mayor, as such; it did not have the concurrence of the two tribunals appointed by the charter for its consideration, and thus never was legally adopted at all. Although the city council is made up of the same persons—the mayor and aldermen—still it is an independent body with a different and explicitly defined jurisdiction, and acts under a different and independent form of procedure. Its jurisdiction is as essentially distinct from that of mayor and aldermen as the functions of a chancellor are distinct from those of a judge.

We hold, therefore, that the taxes in question were assessed upon an invalid list and in an illegal manner.

Judgment affirmed.